CITY OF CLEVELAND,
OHIO, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Cleveland Electric Illuminating
Company, Intervenor.

No. 84–1267.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 22, 1985.

Decided Oct. 8, 1985.

Reuben Goldberg, Washington, D.C., with whom Craig Glazer, Cleveland, Ohio, was on brief, for petitioner.

Joel Cockrell, Atty., F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., and Michael E. Small, Atty., F.E.R.C., Washington, D.C., were on brief, for respondent.

Robert T. Hall, III, Washington, D.C., with whom Richard M. Merriman and James K. Mitchell, were on brief, for intervenor. Stephen C. Huntoon, Washington, D.C., also entered an appearance for intervenor.

Before WRIGHT and SCALIA, Circuit Judges, and MARKEY,* Chief Judge of the United States Court of Appeals for the Federal Circuit.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

This appeal involves a challenge to an order of the Federal Energy Regulatory Commission accepting a compliance filing by the Cleveland Electric Illuminating Company ("CEI")—*i.e.*, a schedule of rates submitted by CEI in purported compliance with instructions contained in an earlier order of the Commission—covering short-term and limited-term power service to the City of Cleveland. The principal legal issues presented are whether supplementary evidentiary hearings were required at the compliance filing stage; whether the compliance filing diverged from the underlying order and, if so, whether such divergence renders Commission approval invalid; and whether the filed schedules set forth the practices affecting CEI's rates in the degree of detail the law and regulations require.

## I

CEI, a public utility regulated under the Federal Power Act, ch. 285, 41 Stat. 1077 (1920) (codified as amended at 16 U.S.C. §§ 791a–828c (1982)), may change the rates, terms and conditions under which it supplies power to Cleveland only in accordance with § 205 of the Act, 16 U.S.C. § 824d, requiring changes to be submitted for Commission approval before they can become effective. Section 205(c) requires the filing and approval to embrace not merely the rates, but also the "practices ... affecting such rates," which include, of course, practices affecting the electrical service for which the rates are charged.

An understanding of the current controversy requires appreciation of two underlying facts: First, that it is no more possible to set forth *all* of the practices affecting rates and services than it is to set forth *all* of the terms and conditions of a contract, leaving nothing whatever to be implied or to be governed by an unspecified standard of reasonableness. In the normal situation of ongoing purchase-sale relationships between utilities and their customers the specification of minor practices is not often

---

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1982).

the subject of dispute. The second underlying fact causes the present case not to be the normal situation—to wit, the hostile relationship of these two reluctant commercial partners, reflected by the following statement in the City's brief:

In the City of Cleveland, City's municipal electric system and CEI are in vigorous competition for residential, commercial and industrial customers. CEI's objective of many years standing is the destruction of the City's system and with it the competitive threat.

Brief for Petitioner at 13 n. 8. As a consequence, neither the City nor, as we shall see, the Commission, was willing to leave as many practices unspecified as is ordinarily the case.

The present dispute began on November 19, 1982, when CEI submitted a proposal that would, *inter alia,* change the terms and conditions under which emergency and firm power service would be made available to the city, effectively eliminating the availability of short-term and limited-term power service.[1] *Cleveland Electric Illuminating Co.,* 22 F.E.R.C. (CCH) ¶ 61,016, at 61,030–31 (Jan. 18, 1983). The Commission accepted CEI's submittal for filing on January 18, 1983, suspended the operation of the new rate schedule for five months, and granted Cleveland's request for intervention and for an expedited hearing on the issue of the terms and conditions of CEI's service.[2] *Id.* at 61,031–32.

In the hearings, CEI altered its position, offering to continue short-term and limited-term service, but subject to a number of terms and conditions. One was that the service would be provided "only when in the sole judgment of the supplying party it is available." The administrative law judge rejected this condition, though similar provisions were contained in rate schedules governing service to other CEI customers. In its place, he ruled that the schedule should provide for the services to be furnished when "reasonably available," and for a written statement of reasons to be given when services are denied or curtailed. *Cleveland Electric Illuminating Co.,* 23 F.E.R.C. (CCH) ¶ 63,055, at 65,197, 65,198 (May 9, 1983) ("ALJ Decision"). In Opinion No. 172, the Commission agreed with the ALJ that, in light of the "competition between and antipathy of the parties," it would not constitute discrimination to require a "reasonably available" provision instead of the "sole judgment" clause used by CEI elsewhere. *Cleveland Electric Illuminating Co.,* 23 F.E.R.C. (CCH) ¶ 61,380, at 61,808 (June 16, 1983) ("Opinion No. 172"). At the suggestion of its staff and with the approval of Cleveland, the Commission made the ALJ's "statement of reasons" requirement more specific, providing for "estimates of loads, capacities and other relevant data by means of which the reserving or purchasing party can assess the availability of such power or need for curtailment." *Id.* at 61,806. Another of CEI's proposed conditions provided that "service shall be dispatched in the same manner as is done currently." ALJ Decision at 65,198. The ALJ rejected this as "unacceptably vague," *id.,* and prescribed instead a provision that would require Cleveland to provide CEI a schedule of the amount of power to be delivered throughout the sales period, and would permit Cleveland to make changes in that schedule at any time, including increases. He stated that this was "consistent with the manner in which CEI scheduled and dispatched power to Painesville [another of CEI's customers] during the past year." *Id.* In Opinion No. 172, the Commission rejected Cleveland's proposal that there be added to this requirement approximately two pages of detailed scheduling and dispatching pro-

---

1. Short-term power refers to electrical power reserved for periods of either one or more weeks or one or more days. Limited-term power refers to power reserved for periods of not less than one month nor more than one year.

2. By agreement of the parties, the proceedings were conducted in two phases: Phase I, out of which this appeal arises, dealing with the terms and conditions of service, and Phase II, dealing with the costs of service. *See Cleveland Electric Illuminating Co.,* 23 F.E.R.C. (CCH) ¶ 63,055, at 65,193 (May 9, 1983).

cedures which the City asserted represented current practices, finding no support in the record for that contention. It accepted instead CEI's proposal "that it will include its practices and policies in its compliance filing, to which [the] City may raise any objections." Opinion No. 172 at 61,806. The Commission rejected, however, CEI's contention that there need not be included among these practices and policies any provision for Cleveland to make changes in its schedule. Though it agreed that the ALJ's provision for unlimited changes may have gone too far, since "the testimony does not state that CEI's practice is to allow frequent schedule changes," it observed that "the evidence indicates that Painesville was permitted to receive more power than originally scheduled several times in 1982." *Id.* at 61,808–09. The Commission resolved this issue by ordering that the practices and policies to be set forth by CEI in its compliance filing should assure that Cleveland "be accorded the same flexibility as Painesville, and no more." *Id.* at 61,809.

Opinion No. 172 was issued on June 16, 1983. On August 30, CEI submitted the revised schedules for filing, and in comments filed on October 3 Cleveland objected to a number of provisions as being inconsistent with Opinion No. 172. After CEI filed an Answer and Response, the Commission by letter order of March 1, 1984, rejected the City's objections (with minor exceptions) and accepted CEI's schedules for filing. *Cleveland Electric Illuminating Co.*, 26 F.E.R.C. (CCH) ¶ 61,-320 (Mar. 1, 1984) ("Acceptance Order"). Cleveland has appealed that action under § 313(b) of the Federal Power Act, 16 U.S.C. § 825*l* (b).

## II

Cleveland contends that CEI's compliance filing failed to comport with Opinion No. 172 in significant respects. In particular, it points to three provisions concerning scheduling and dispatch[3] and three provisions concerning availability and curtailment.[4] Cleveland argues that FERC's failure to conduct further hearings before accepting the compliance filing was contrary to law; that its acceptance of the provisions that deviated from Opinion No. 172 was arbitrary and capricious; that the "deviant" provisions are not supported by substantial evidence; and that they are in sev-

3. Cleveland objects to the italicized language in the following sections of Service Schedule C of the compliance filing:

§ 2.11 ... The right of the reserving party to request power at any time and the right of the reserving party to revise a written schedule *are not intended as substitutes for good faith observance of established multilateral procedures by which potential power purchasers communicate with potential power sellers to buy and sell power on a nondiscriminatory basis....*

§ 5.2 ... The reserving party can *occasionally, because of unusual circumstances,* change the schedule and should provide at least one-day notice for such schedule change *up to the reserved amount.*
J.A. 148, 155.

4. Cleveland objects to the italicized language in the following sections of Service Schedule C of the compliance filing:

§ 2.11 ... If, during a reservation period, conditions arise that could not have been reasonably foreseen at the time of the reservation and cause the reservation to be burdensome to the supplying party or its system, such party may by oral notice to the reserving party, such oral notice to be later confirmed in writing if requested by either party, reduce the number of kilowatts reserved by such amount and for such time as it shall specify in such notice, but kilowatts reserved hereunder that the supplying party is in turn reserving from another system may be reduced only to the extent they are reduced by such other system *or when during such period conditions arise that could not have been reasonably foreseen at the time of the reservation and cause the transmission to be burdensome to the supplying party's system.*

§ 5.1 ... *approval of certain transactions may require authorization by an officer of the Company.*

§ 5.3 ... [In determining how to allocate available power between the City and other purchasers, CEI may] *consider any factors it deems to be relevant,* including, but not limited to, the time the respective requests were received, the amount of power requested, the duration of the request, alternatives available to particular purchasers, *and the likelihood that a particular purchaser may be able to provide reciprocal assistance to the seller at some point in the future....*
J.A. 148–49, 154, 155.

eral instances impermissibly vague. We discuss these contentions in order.

## A

Cleveland's principal claim is that the Commission's acceptance of the contested provisions of the compliance filing without holding further hearings "resulted in the denial ... of due process of law." Brief for Petitioner at 27. That could mean, of course, either a denial of the process "due" under applicable statutes, or a denial of the minimal procedural protections guaranteed by the Fifth Amendment to the Constitution. Perhaps the ambiguity is intentional. We decline to conduct our analysis in constitutional terms, since even if a general utility-regulation statute such as the Federal Power Act could be thought to confer upon customers individual property rights of the sort that would invoke the due process clause, *but see Georgia Power Project v. Georgia Power Co.,* 409 F.Supp. 332, 338–41 (N.D.Ga.1975); *Sellers v. Iowa Power & Light Co.,* 372 F.Supp. 1169, 1172 (S.D.Iowa 1974),[5] as far as the outcome of this case is concerned it would make no difference. Federal courts would hardly interpret the unspecified "full hearings" requirement of § 205(e) to permit procedures so inadequate that, if the due process clause were applicable, they would not pass muster. We see the issue before us, then, to be what procedures were required by § 205 (in light of what might be termed the common law of administrative process to which its "full hearings" provision referred) and by the subsequently enacted provisions of the Administrative Procedure Act, 5 U.S.C. §§ 551–59 (1982).

More specifically, the question is whether the Commission contravened these provisions of law by denying Cleveland an opportunity to introduce record evidence, and to produce and cross-examine witnesses, after CEI's submission of its compliance filing. It would be absurd to contend that these procedures were required merely because the text of the provisions contained in the compliance filing was new. If FERC could approve no final language without evidentiary hearings on the particular text, ratemaking proceedings would stretch on interminably—the hearings on one text leading to a revision which would in turn have to be the subject of evidentiary hearings. *Cf. Community Nutrition Institute v. Block,* 749 F.2d 50, 58 (D.C.Cir.1984). The abstract objection of lack of opportunity to have an evidentiary hearing on the specific text is akin to the objection of a petitioner who contests the outcome of an informal rulemaking proceeding on the ground that the proposed rule set forth in the notice of rulemaking did not contain a provision ultimately promulgated. In that context we have said "[n]otice [under 5 U.S.C. § 553(b)] need not contain every precise proposal which the agency ultimately may adopt as a rule. Rather notice is sufficient if the description of the 'subjects and issues involved' affords interested parties a reasonable opportunity to participate in the rulemaking." *Trans-Pacific Freight Conference of Japan/Korea v. Federal Maritime Commission,* 650 F.2d 1235, 1248 (D.C.Cir.1980) (footnote omitted), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981). *Mutatis mutandis,* the same principle applies here.

The precise questions before us, then, are (1) what issues were relevant to Commission approval of the compliance filing; (2) whether, as to those particular issues, the opportunity for an evidentiary hearing had to be provided; and (3) if so, whether that opportunity was adequately provided in the evidentiary hearings that preceded Opinion No. 172. To simplify our analysis, we intend to omit the second step, assuming without deciding that an evidentiary

**5.** In *Northern California Power Agency v. Morton,* 396 F.Supp. 1187, 1192–94 (D.D.C.1975), the court apparently upheld constitutional due process claims of ratepayers where the requisite property interest had been conceded by the government. What was at issue, however, was not sales of privately generated power by a rate-regulated company, but sales by the Department of the Interior of energy generated by a federal reclamation project and statutorily required to be sold to municipalities and cooperatives as preference customers.

hearing was required as to all relevant issues.

 The principal issue presented by this compliance filing, as by any, was whether the provisions included in the schedule accorded with the directions of the underlying order. Cleveland asserted errors of both commission and omission—*i.e.*, the *inclusion* of certain provisions that did *not* reflect, as Opinion No. 172 said they should, CEI's general practices or its practices specifically applicable to Painesville; and the *omission* of provisions that *did*. As to both, we think Cleveland had ample opportunity to present its own evidence and to test CEI's, by cross-examination and otherwise, in the earlier proceedings. A major object of the hearings before the ALJ was to identify the practices of CEI. Whether the ultimate inclusion or omission of certain practices is not supported by the evidence is a separate question, which we shall address in due course below. But the contention that Cleveland had no opportunity to make a record on the point is simply unsupportable.

Cleveland argues that in the circumstances of the present case a further issue presented by the compliance filing was whether its provisions were, as the statute requires, just and reasonable.[6] Such an argument can normally be rejected out of hand when, as here, the petitioner attacks a compliance filing made pursuant to an underlying order the petitioner accepted as valid. (Cleveland acknowledges that it "did not and does not contest" the findings of Opinion No. 172. Reply Brief for Petitioner at 9.) Since the underlying order consists precisely of a determination that what it prescribes will produce just and reasonable rates, the only issue remaining is whether the compliance filing accords with what it prescribes. When, however, the prescription is as indeterminate as some of the provisions at issue here (notably, the

prescription that CEI set forth the practices governing scheduling and dispatch of its service to Painesville, without prior determination of what those practices were) it seems to us correct that no determination of justness and reasonableness can realistically be said to have been made and acquiesced in at the stage of the original order. That issue also, however, was plainly the subject of the earlier hearings, at which Cleveland had ample opportunity to demonstrate that those practices which CEI sought to establish were unjust and unreasonable, or that it would be unjust and unreasonable not to adopt additional practices as well. Cleveland concedes that "policies and practices or terms and conditions of service, their meaning, implementation, and consistency with the ratemaking standards of the Power Act were fully explored at the hearing and in subsequent briefs," Brief for Petitioner at 9–10, and that "considerable cross-examination was devoted to CEI's practices, policies and procedures relating to marketing and scheduling of short-term and limited term [*sic*] power." *Id.* at 37. The Commission may have deferred its final judgment on justness and reasonableness until the compliance filing; and the adequacy of the evidence to support that judgment can assuredly be challenged; but the claim of denial of opportunity to develop evidence is simply unfounded.

Our decision on this point is unaffected by the Commission's assurance in Opinion No. 172 that CEI "will include its practices and policies in its compliance filing, to which [the] City may raise any objections." Opinion No. 172 at 61,806. That cannot reasonably be read as a commitment to reopen the evidentiary stage of the proceeding. Cleveland was permitted to file written objections and arguments based on the existing record, which we think fully redeems the Commission's pledge.

---

6. Cleveland also asserts that the nondiscriminatoriness of the terms and conditions was at issue. We disregard that contention. Except with regard to those matters on which Cleveland was to receive treatment more favorable than other customers (of which it has no standing to complain), Opinion No. 172 required the filed provisions under challenge here to consist of CEI's practices and policies applicable to other customers. The issue of discrimination and the issue of compliance with the Opinion were therefore one and the same.

B

Cleveland argues that the Commission's acceptance of a compliance filing that did not conform with its underlying order was "arbitrary or capricious" agency action, prohibited by 5 U.S.C. § 706(2)(A). Counsel for the Commission deny any lack of conformity. On at least several of the contested points, Cleveland has the better of that argument. Opinion No. 172, fairly read, contemplated a specific description in the schedules of the so-called "market day practices" by which availability of service is determined. *See* Opinion No. 172 at 61,-809, 61,809–3. The compliance filing, however, only made generic reference to the existence of these practices (there referred to as "multilateral procedures"); and the Commission's response to Cleveland's objections was that "we believe that the other modifications made to the contract at the Commission's direction, together with the less detailed language included herein, will serve to protect the interest of [the] City while still affording CEI flexibility to operate." Acceptance Order at 61,694. This seems to us not a finding of compliance but a sober second thought; the Commission concluded that the degree of detail it had contemplated in the first instance was not really needed. Similarly, although Opinion No. 172 prescribed that, as to schedule changes, the "City should be accorded the same flexibility as Painesville," and acknowledged that Painesville had been "permitted to receive more power than originally scheduled several times in 1982," Opinion No. 172 at 61,809, the Commission accepted a provision in CEI's filing that limited schedule changes to the reserved amount. Its explanation was that "[w]e believe that CEI has made a good faith attempt to meet the Commission's requirements, while ensuring that CEI is not left open to unlimited and frequent schedule changes. With respect to the limitation of changes up to the reserved amount, we believe this is appropriate, inasmuch as revisions over the reserved amount would constitute a new request for service." Acceptance Order at 61,693 (footnote omitted). We think it more accurate to charac-terize this as approval of adjustment than determination of compliance.

There is, however, nothing wrong with such adjustments, so long as, at the conclusion of the proceeding, when the Commission has accepted the compliance filing, its reasons for doing so have been adequately set forth, are reasonable, and have factual support in the record. It is not the case that the Commission's underlying order—Opinion No. 172—is a final judgment to which the compliance filing *must* conform. To the contrary, it is merely one stage in an ongoing proceeding that is not completed until the rates themselves are approved. *See Electrical District No. 1 v. FERC*, 774 F.2d 490 (D.C.Cir.1985). If the Commission chooses to hold the compliance filing to every jot and tittle of the underlying order, that is well and good (assuming the order itself is adequately supported); but it may also entertain second thoughts and revise its earlier judgment.

Petitioner's assertion of arbitrary or capricious action would nonetheless be sustainable if the basis for the Commission's approval was not an evaluation of the altered provisions on their own merits, but an erroneous belief that they "complied" with earlier determinations. An indication of this state of affairs is arguably to be found in the Commission's general introduction to discussion of the short-term and limited-term firm power service schedules, which expressed the conclusion "that CEI has constructed [those] schedules in compliance with the Commission's directives." Acceptance Order at 61,692. Reading the Acceptance Order as a whole, however, we think it clear that the Commission was, in the few respects in which compliance was not achieved, reevaluating the compliance filing on its own merits. The Order specifically addressed each of Cleveland's objections in some detail, reflecting, as we have described above, an awareness that certain adjustments were being made. We view the conclusion of "compliance" set forth in the preface to that detailed discussion as an exaggeration rather than an indication

of confusion—or more charitably (if one considers ambiguity a less serious failing than exaggeration), as an assertion of "compliance in spirit" rather than compliance with text. While it would have been most precise and candid for the Commission to acknowledge outright that it had changed its mind on a few points en route to its conclusion, the superlative degrees of those particular qualities are rarely to be found even separately; to demand them in concert would place an unrealistic burden upon the administrative process. It is clear from the Acceptance Order as a whole that the Commission was under no illusion as to whether the compliance filing technically conformed to Opinion No. 172; that its assertion of technical compliance, if any, was exaggeration rather than self-delusion; that, in short, it knew what it was doing. The Commission's "path may reasonably be discerned," *Bowman Transportation, Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974), and petitioner's objections on this score must be rejected.

### C

Cleveland's remaining objections go to the merits of the Commission's judgment. First, the City asserts lack of record support for a number of the factual premises underlying that judgment—in particular, for the proposition that the various challenged features of the schedule represented the practices CEI followed in providing service to Painesville and other customers. We have examined each of these contentions and find substantial evidence to support the Commission's determinations.

Second, Cleveland contends that certain provisions of the compliance filing are impermissibly vague. We noted previously that § 205(c) of the Federal Power Act requires rate filings to recite "the ... practices ... affecting such rates and charges." 16 U.S.C. § 824d(c). FERC regulations go even further, requiring that rate schedules set forth "clearly and specifically," 18 C.F.R. § 35.1(a) (1985), "all ... practices ... which in any manner affect or relate to

... service, rates, and charges," *id.* at § 35.2(b). Cleveland argues that in accepting some of the vague provisions of the compliance filing FERC violated the statute and the regulations.

As we observed earlier, there is an infinitude of practices affecting rates and service. The statutory directive must reasonably be read to require the recitation of only those practices that affect rates and service *significantly,* that are realistically *susceptible* of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous. It is obviously left to the Commission, within broad bounds of discretion, to give concrete application to this amorphous directive. *See Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System,* 745 F.2d 677, 697 (D.C. Cir.1984) (particularly broad discretion accorded to an agency charged with applying "a standard of ... inherent imprecision"). For the same pragmatic reasons, we do not read the Commission's regulations, more verbally profuse though they might be, as prescribing numeration of the innumerable; they essentially serve to repeat the statutory prescription with added warning that the Commission may require filings to be as specific and detailed as (within the law) it wishes.

The issue, then, is whether the provisions challenged as exclusively vague fall short—not of some absolute prescribed standard literally set forth in the statute and regulations—but of the minimum specificity that the Commission could reasonably require. If the question were merely whether Cleveland's rate schedule had to be more specific than the schedules for CEI's other customers, we might find that the antagonistic relationship between these two parties reasonably required such treatment. But considerably greater specificity *has* been provided. Almost all of the challenges before us pertain to provisions which, as vague as they are, go beyond what is set forth in CEI's rate schedules for its other customers. We are asked to

reverse the Commission because it did not provide a sufficient *degree* of added specificity—much more of a judgment call. We find no basis for upsetting the Commission's judgment.

The "multilateral procedures" referred to in § 2.11 could certainly have been spelled out, a possibility the Commission itself grudgingly acknowledged. *See* Acceptance Order at 61,694. But especially in light of the fact that the term referred to procedures extensively explained in the record, *see id.* at 61,696 n. 5, we cannot find such specification to be indispensable. Similarly, the provision of § 5.3 that in determining the availability of service CEI may "consider any factors it deems to be relevant, including, but not limited to, [certain specified factors]" is assuredly vague. It is not, however, open-ended, since as the Commission noted it is inherently limited by the provision of § 2.1 that service shall be provided when reasonably available. And we cannot second-guess the Commission's expert judgment (indeed, our inexpert guess would conform to the Commission's conclusion) that the provision for "any factors" was "necessarily general to permit adaptability to changing day-to-day operations," *id.* at 61,695. Likewise the provision of § 2.11 permitting curtailment "when ... conditions arise that could not have been reasonably foreseen at the time of the reservation and cause the transmission to be burdensome to the supplying party's system." Enumerating unforeseen conditions is a risky business. It might have been practically possible to specify the "certain transactions" referred to in § 5.1 that would "require authorization by an officer of the company." But that hardly seems a provision of such central importance—even in this antagonistic setting—as to require specification, especially since, as the Commission noted in accepting the language, CEI has been directed "to follow up any refusal of power with a written explanation of the criteria for refusal," and Cleveland "has recourse to the Commission should CEI refuse power on an improper or discriminatory basis." *Id.* at 61,694.

\*　　\*　　\*　　\*　　\*　　\*

The short of the matter is that the Commission has required and approved a rate schedule significantly more detailed, for this type of interruptible service, than is customary, and one that could reasonably be thought to provide adequately for the special needs of this hostile relationship. It may not be as restrictive as Cleveland would desire. Indeed, it may not even be as restrictive as Cleveland had good reason to *expect* after the expansive language of Opinion No. 172. But insofar as that expectation pertained to matters within the scope of agency discretion, the Commission tentatively gaveth and the Commission hath ultimately taken away. So long as proper procedures have been followed, intelligible reasons have been given, and factual findings are supported by record evidence, the Commission must be affirmed. That is the case here.

The petition for review is

*Denied.*