EDWARDS, Senior Circuit Judge,
dissenting:
Under the Federal Power Act, regulatory authority over the nation’s electricity markets is bifurcated between the States and the federal government. In simplified terms, the Federal Energy Regulatory Commission (“FERC” or “Commission”) has authority over wholesale electricity sales but not retail electricity sales, with the latter solely subject to State regulation. See 16 U.S.C. § 824(a), (b)(1). The consolidated petitions before the court call on us to parse this jurisdictional line between FERC’s wholesale jurisdiction and the States’ retail jurisdiction — a line which this court and the Supreme Court have recognized is neither neat nor tidy. See New York v. FERC, 535 U.S. 1, 16, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (“[T]he landscape of the electric industry has *226 changed since the enactment of the [Federal Power Act], when the electricity universe was ‘neatly divided into spheres of retail versus wholesale sales.’” (quoting Transmission Access Policy Study Grp. v. FERC, 225 F.3d 667, 691 (D.C.Cir.2000))).
Petitioners challenge Order 745, a rule imposing certain compensation requirements on the administrators of the nation’s wholesale electricity markets. See Order 745, Demand Response Compensation in Organized Wholesale Energy Markets, 134 FERC ¶ 61,187, 2011 WL 890975, at *1 (Mar. 15, 2011). The rule requires these wholesale-market administrators — called Regional Transmission Organizations (“RTOs”) and Independent System Operators (“ISOs”) — to compensate so-called “demand response resources” at a specified price when certain conditions are met. As relevant here, “demand response resources” are essentially electricity consumers, often bundled together by a third-party aggregator, who agree to reduce their electricity consumption in exchange for incentive payments. See 18 C.F.R. § 35.28(b)(4)-(5). The pun scattered throughout the record is that while generators produce megawatts, consumers produce “negawatts.” In effect, Order 745 requires that, at certain times, megawatts and negawatts receive the same amount of payment in wholesale markets, an amount called the “locational marginal price” or “LMP.”
Although the challenged rule requires ISOs and RTOs to pay demand response resources a specified compensation (LMP), this requirement is applicable only when two conditions are met: (1) when the demand response resource is capable of balancing supply and demand in the wholesale market, and (2) when compensating the demand response resource is cost-effective under a “net benefits test” prescribed by the rule. The specific mechanics of these conditions and of the “net benefits test” are less important than what they accomplish. The critical point here is that, because of the specified conditions, Order 745 requires compensation of demand response resources only when their participation in a wholesale electricity market actually lowers the market-clearing price for wholesale electricity.
With these basics in hand, it is easy to see why FERC stated in its rulemaking that “jurisdiction over demand response is a complex matter that lies at the confluence of state and federal jurisdiction.” Order 745, 2011 WL 890975, at *30. On one view, the demand response resources subject to the rule directly affect the wholesale price of electricity. That is, the final rule’s conditions operate to ensure that every negawatt of forgone consumption receiving compensation reduces both the quantity of electricity produced and its wholesale price. Focusing on this direct effect — direct, it bears repeating, because under the rule’s conditions all demand response resources receiving compensation reduce the market-clearing price — it is easy to conceive of Order 745 as permissibly falling on the wholesale side of the wholesale-retail jurisdictional line. On another view, however, the electricity not consumed thanks to the rule’s compensation payments would have been consumed first in a retail market. Focusing on the market in which the consumption would have occurred in the first instance, one can conceive of Order 745 as impermissibly falling on the retail side of the jurisdictional line.
The task for this court, of course, is not to divine from first principles whether a demand response resource subject to Order 745 is best considered a matter of wholesale or retail electricity regulation. Rather, our task is one of statutory interpretation within the familiar Chevron *227 framework. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); see also Cal. Indep. Sys. Operator Corp. (CAISO) v. FERC, 372 F.3d 395, 399-400 (D.C.Cir.2004). The Commission has interpreted the Federal Power Act to permit it to issue Order 715. And it falls to this court to determine whether the Act unambiguously “sp[eaks] to the precise question,” 467 U.S. at 842, 104 S.Ct. 2778 (Chevron step one), and, if not, whether the Commission’s interpretation is a permissible construction of the statute, id. at 843, 104 S.Ct. 2778 (Chevron step two).
Though the rule and its operation are highly technical, the primary jurisdictional issue raised in these consolidated petitions turns on a rather straightforward question of statutory interpretation: whether a promise to forgo consumption of electricity that would have been purchased in a retail electricity market unambiguously constitutes a “sale of electric energy” under section 201(b)(1) of the Federal Power Act. 16 U.S.C. § 824(b)(1). If so, the Commission lacked jurisdiction to issue Order 715 because section 201(b)(1) of the Act states, in relevant part, that the “provisions of this subchapter shall apply ... to the sale of electric energy at wholesale in interstate commerce, but ... shall not apply to any other sale of electric energy. ” Id. (emphasis added).
The statute, to my mind, is ambiguous regarding whether forgone consumption constitutes a “sale” under section 201(b)(1). Because of this ambiguity, the Act is also ambiguous as to whether a rule requiring administrators of wholesale markets to pay a specified level of compensation for such forgone consumption constitutes “direct regulation” of retail sales that would contravene the limitations of section 201. Conn. Dep’t of Pub. Util. Control v. FERC, 569 F.3d 477, 481-82 (D.C.Cir.2009) (holding that FERC’s approval of an Installed Capacity Requirement was not “direct regulation ” of electrical generation facilities and, thus, did not violate section 201 (emphasis added)). Because the Act is ambiguous regarding FERC’s authority to require ISOs and RTOs to pay demand response resources, we are obliged to defer under Chevron to the Commission’s permissible construction of “a statutory ambiguity that concerns the scope of the agency’s statutory authority (that is, its jurisdiction).” City of Arlington v. FCC, — U.S. -, 133 S.Ct. 1863, 1868, 1874-75, — L.Ed.2d - (2013).
Absent an affirmative limitation under section 201, there is no doubt that demand response participation in wholesale markets and the ISOs’ and RTOs’ market rules concerning such participation constitute “praetice[s] ... affecting” wholesale rates under section 206 of the Act. 16 U.S.C. § 824e(a); see also id. § 824d(a) (providing that “all rules and regulations affecting or pertaining to [wholesale] rates or charges shall be just and reasonable”). Petitioners’ arguments to the contrary ignore the direct effect that the ISOs’ and RTOs’ market rules have on wholesale electricity rates squarely within FERC’s jurisdiction. The Commission has authority to “determine the just and reasonable ... practice” by setting a level of compensation for demand response resources that, in its expert judgment, will ensure that the rates charged in wholesale electricity markets are “just and reasonable.” Id. § 824e(a). It was therefore reasonable for the Commission to conclude that it could issue Order 715 under the Act’s “affecting” jurisdiction. See id. §§ 824e(a), 824d(a).
In addition to challenging FERC’s jurisdiction, Petitioners argue that its decision to mandate compensation equal to the LMP was arbitrary and capricious. Peti *228 tioners believe that the LMP overeompen-sates demand response resources since they also realize savings from not having to purchase retail electricity. The Commission, Petitioners insist, should have set the compensation level at the LMP minus the retail cost of the forgone electricity. But the Commission’s decision in this regard was reasonable and adequately explained.
For these reasons, explained below in greater detail, I respectfully dissent.
I. Background
A. The Problem
To understand this case, one must appreciate the scope and significance of the problem FERC sought to address in Order 745. Three characteristics of the nation’s electricity market go a long way toward framing the problem. First, electricity, unlike most commodities, cannot be stored for later use. There must instead be a continual, contemporaneous matching of supply to meet current electricity demand. Second, not all power plants are created equal: some are efficient and cheap; others, inefficient and expensive. Third, most retail consumers are charged a fixed price for electricity that does not adjust in the moment to temporary spikes in the cost of producing electricity.
The first two characteristics, in tandem, cause significant fluctuations in the cost of supplying electricity at different times of day. During periods of regular electricity consumption, only the efficient and cheap power plants need be deployed. But at hours of peak usage (e.g., a summer afternoon in Washington, D.C. when countless air conditioners toil against the humidity and heat), the suppliers of electricity must marshal the least efficient and most costly power plants to match the soaring demand for electricity. It is because electricity cannot be efficiently stored that these periods of peak demand must be met with new generation and not stockpiled supply.
In a perfect market, or even in a well-functioning market, the skyrocketing cost of producing additional electricity at hours of peak usage would be reflected in temporarily higher prices charged to consumers. In turn, this increased price would reduce the megawatts of electricity demanded, as some individuals and businesses would, for example, turn off their air conditioners to save money. The market would thereby reach an efficient equilibrium.
But here is where the third characteristic of electricity markets comes in. Retail electricity prices are generally regulated to remain constant over longer periods of time. That is, consumers do not pay different amounts during different hours of the day, notwithstanding the sharply vacillating cost of producing electricity. Electricity demand thus does not respond to time-sensitive price signals. As a result, there are times when people and businesses consume electricity that costs more to produce than it is worth to them to consume. This is inefficient.
Wholesale electricity markets, which are under FERC’s jurisdiction, suffer the same inefficiency. Since retail demand is not price-responsive, the aggregate amount of electricity demanded in the wholesale market by the entities that serve retail customers is also uncoupled from the time-specific price of supplying electricity. In economic terms, the demand for electricity in the wholesale market is inelastic. See Order 745-A, Demand Response Compensation in Organized Wholesale Energy Markets, 137 FERC ¶ 61,215, 2011 WL 6523756, at *9 (Dec. 15, 2011).
The Commission recognizes the problem. As it observed in its order denying requests for rehearing of Order 74.5,
*229 [a] properly functioning market should reflect both the willingness of sellers to sell at a price and the willingness of buyers to purchase at a price. In an RTO- or ISO-run market, however, buyers are generally unable to directly express their willingness to pay for a product at the price offered. As discussed later, RTOs and ISOs cannot isolate individual buyers’ willingness to pay which results in extremely inelastic demand.
Id.; see also Order 745, 2011 WL 890975, at *1 (“[A] market functions effectively only when both supply and demand can meaningfully participate.” (emphasis added)).
B. FERC’s Solution
Having identified a problem in the wholesale electricity market, the Commission has a statutory obligation to do what it can to fix it. That is because FERC is charged under the Federal Power Act with ensuring that wholesale electricity rates are “just and reasonable.” 16 U.S.C. §§ 824d(a), 824e(a). It must ensure that all “rates and charges made, demanded, or received by any public utility for or 'in connection with the ... sale of electric energy subject to the jurisdiction of the Commission” are “just and reasonable.” Id. § 824d(a) (emphasis added); see also id. § 824(a). And when FERC determines that a “practice ... affecting” such a rate is unjust or unreasonable, it must itself determine and fix “the just and reasonable ... practice ... to be thereafter observed.” Id. § 824e(a).
Consistent with its statutory duty and in view of the market distortions caused by inelastic wholesale demand, the Commission has initiated a series of reforms to open wholesale markets to “demand response resources.” For our purposes, “demand response resources” are resources that are capable of reducing “the consumption of electric energy by customers from their expected consumption in response ... to incentive payments designed to induce lower consumption of electric energy.” 18 C.F.R. § 35.28(b)(4)-(5). Put simply, demand response resources agree not to purchase electricity in exchange for payment.
The basic premise of FERC’s demand-response reforms is that there are two ways that wholesale-market administrators (ie., ISOs and RTOs) can balance wholesale supply and demand: by increasing the supply of electricity or by decreasing the demand for it. See Order 745-A, 2011 WL 6523756, at *14. An ISO or RTO reduces wholesale demand when it pays a demand response resource because that resource will forgo electricity consumption in the retail market, which, in turn, will lead to fewer megawatts of electricity being demanded in the aggregate in that ISO’s or RTO’s wholesale market. At certain times (e.g., summer afternoons in Washington, D.C.), paying incentive payments to induce consumers not to consume electricity may be cheaper than paying generators to produce more power; negawatts, in such circumstances, are the cheaper alternative. And because, functionally, there is little difference to wholesale-market administrators between a megawatt and a negawatt (both assist equally in the administrator’s task of bringing wholesale demand and supply into equipoise), demand response resources are capable of competing directly with traditional generation resources so long as the appropriate market rules are in place.
For some years now, FERC has recognized that the direct participation of demand response resources in wholesale markets improves the functioning of these markets in several respects. First, it lowers wholesale prices because “lower demand means a lower wholesale price.” Order 719-A, Wholesale Competition in *230 Regions with Organized Electric Markets, 128 FERC ¶ 61,059, 2009 WL 2115220, at *12 (July 16, 2009). Second, it mitigates the market power of suppliers of electricity because they have to compete with demand response resources and adjust their bidding strategy accordingly. See id. (“[T]he more demand response is able to reduce peak prices, the more downward pressure it places on generator bidding strategies by increasing the risk to a supplier that it will not be dispatched if it bids a price that is too high.”). Third, demand response “enhances system reliability,” for example, by “reducing electricity demand at critical times (e.g., when a generator or a transmission line unexpectedly fails).” Id. at *12 & n. 76; see also Order 745-A 2011 WL 6523756, at *6 (“[Djemand response generally can be dispatched by the [ISO or RTO] with a minimal notice period, helping to balance the electric system in the event that an unexpected contingency occurs.”).
The benefits of demand response participating in wholesale markets are beyond reproach. Commissioner Moeller, who dissented in Order 74.5, put it best:
While the merits of various methods for compensating demand response were discussed at length in the course of this rulemaking, nowhere did I review any comment or hear any testimony that questioned the benefit of having demand response resources participate in the organized wholesale energy markets. On this point, there is no debate. The fact is that demand response plays a very important role in these markets by providing significant economic, reliability, and other market-related benefits.
Order 745, 2011 WL 890975, at *34 (emphasis added) (Moeller, dissenting).
It is no surprise, then, that FERC has initiated a series of reforms to open up its markets to demand response, on the theory that doing so helps to ensure “just and reasonable” wholesale rates by improving how these markets function in the three ways just mentioned. See Order 890, Preventing Undue Discrimination and Preference in Transmission Service, 72 Fed. Reg. 12,226, 12,378 (Mar. 15, 2007); Order 719, Wholesale Competition in Regions with Organized Electric Markets, 73 Fed. Reg. 64,100 (Oct. 28, 2008); see also Br. for Resp’t at 11-13 (providing overview of these rulemakings); id. at 12 (noting that, before Order 719, FERC had approved proposals by various ISOs and RTOs “to allow demand response participation in their ancillary services markets” (citations omitted)).
In particular, in Order 719 FERC required ISOs and RTOs to “accept bids from demand response resources in RTOs’ and ISOs’ markets for certain ancillary services on a basis comparable to other resources” and, in certain circumstances, to “permit an aggregator of retail customers ... to bid demand response on behalf of retail customers directly into the organized energy market.” Order 719-A, 2009 WL 2115220, at *1. But FERC placed an important condition on this requirement; ISOs and RTOs were required to accept bids from demand response “unless not permitted by the laws or regulations of the relevant electric retail regulatory authority.” 18 C.F.R. § 35.28(g)(l)(i)(A), (iii); Order 719-A 2009 WL 2115220, at *13. Finally, recognizing that “further reforms may be necessary to eliminate barriers to demand response in the future,” FERC further ordered ISOs and RTOs to “assess and report on any remaining barriers to comparable treatment of demand response resources that are within the Commission’s jurisdiction.” Order 719-A 2009 WL 2115220, at *1.
And further reforms were indeed necessary. Prior to issuing Order 745, ISOs *231 and RTOs had differing practices concerning the level of compensation to be paid to demand response resources in their markets. Order 745, 2011 WL 890975, at *4. The Commission found that many ISOs and RTOs undercompensated demand response resources in certain circumstances. See id. at *16. It reached this finding in light of existing barriers to demand response participation in wholesale markets, including “the lack of market incentives to invest in enabling technologies that would allow electric customers and aggregators of retail customers to see and respond to changes in marginal costs of providing electric service as those costs change.” Id.; see also id. (“[T]he inadequate compensation mechanisms in place today in wholesale energy markets fail to induce sufficient investment in demand response resource infrastructure and expertise that could lead to adequate levels of demand response procurement. Without sufficient investment in the development of demand response, demand response resources simply cannot be procured because they do not yet exist as resources. Such investment will not occur so long as compensation undervalues demand response resources.” (emphasis added) (quoting a commenter)).
Order 7Jp5 sought to correct the under-compensation problem by mandating that ISOs and RTOs pay demand response resources the same market price that they pay to generators, i.e., LMP. But it limited this compensation requirement to circumstances where two specific conditions are met. LMP-compensation would be required only when (1) “the demand response resource [is] able to displace a generation resource in a manner that serves the RTO or ISO in balancing supply and demand,” and (2) “the payment of LMP ... [is] cost-effective, as determined by [a] net benefits test.” Id. at *13; see also 18 C.F.R. § 35.28(g)(l)(v)(A).
FERC understood that it had authority to correct the under-compensation problem because, in the absence of adequate compensation, too few demand response resources affirmatively bid into the wholesale markets. And such participation is necessary for the market to function rationally and reach “just and reasonable” rates. As FERC stated:
We find, based on the record here that, when a demand response resource has the capability to balance supply and demand as an alternative to a generation resource, and when ... paying LMP to that demand response resource is shown to be cost-effective as determined by the net benefits test described herein, payment by an RTO or ISO of compensation other than the LMP is unjust and unreasonable. When these conditions are met, we find that payment of LMP to these resources will result in just and reasonable rates for ratepayers.
Order 7Jp5, 2011 WL 890975, at *13 (emphasis added).
II. Analysis
A. Jurisdiction
Petitioners argue that Order 715 is “in excess” of FERC’s “statutory jurisdiction.” Br. of Pet’rs Elec. Power Supply Ass’n, et al. (“Br. of Pet’rs”) at 27 (citing 5 U.S.C. § 706(2)(C)). We evaluate this contention under Chevron and defer to FERC’s permissible construction of its authorizing statute, regardless of “whether the interpretive question presented is ‘jurisdictional.’ ” City of Arlington, 133 S.Ct. at 1874-75; see also Connecticut, 569 F.3d at 481. The proper question is thus whether the Act unambiguously forecloses FERC from issuing Order 7h5 under its “affecting” jurisdiction. See 16 U.S.C. § 824e; Chevron, 467 U.S. at 842, 104 S.Ct. 2778.
*232 FERC’s explanation of its jurisdiction under the Federal Power Act is straightforward and sensible. FERC has the authority and responsibility to correct any “practice ... affecting” wholesale electricity rates that the Commission determines to be “unjust” or “unreasonable.” 16 U.S.C. § 824e(a); see also id. § 824d(a). In its view, the ISOs’ and RTOs’ rules governing the participation of demand response resources in the nation’s wholesale electricity markets are “practices affecting [wholesale electricity] rates.” Order 715-A, 2011 WL 6523756, at *10 (quoting 16 U.S.C. §§ 824d, 824e). That is, an ISO’s or RTO’s market rules governing how a demand response resource may compete in its wholesale market, including the terms by which a demand response resource is to be compensated in the market, are “practices affecting” that wholesale market’s rates for electricity. And FERC has determined that an ISO’s or RTO’s “practice” is unjust and unreasonable to the degree that it inadequately compensates demand response resources capable of supplanting more expensive generation resources. See id. at *36. As explained above, FERC has found that demand response improves the functioning of wholesale markets by (1) lowering the wholesale price of electricity, (2) exerting downward pressure on generators’ market power, and (3) enhancing system reliability.
FERC’s explanation is consistent with our case law. In Connecticut, we considered whether FERC has jurisdiction to review an ISO’s capacity charges. 569 F.3d at 478-79. Capacity is not electricity but the ability to produce it when needed, and in Connecticut the ISO had established a market where capacity providers — generators, prospective generators, and demand response resources — competitively bid to meet the ISO’s capacity needs three years in the future. Id. at 479-81. Generation, like retail sales, is expressly the domain of State regulation under section 201, 16 U.S.C. § 824(b)(1), and the petitioners argued that by increasing the overall capacity requirement the ISO was improperly requiring the installation of new generation resources. 569 F.3d at 481. We disagreed and held that FERC had “affecting” jurisdiction under section 206 because “capacity decisions ... affect FERC-jurisdictional transmission rates for that system without directly implicating generation facilities.” Id. at 484. That the capacity requirement helped to “find the right price” was enough of an effect to satisfy section 206. Id. at 485.
Petitioners’ specific arguments against FERC’s exercising jurisdiction are unpersuasive. First, Petitioners note that section 201 of the Act establishes a clear jurisdictional line between “the sale of electric energy at wholesale in interstate commerce,” which is properly the subject of FERC’s jurisdiction, and “any other sale of electric energy.” Br. of Pet’rs at 27-28 (citing 16 U.S.C. § 824(a), (b)(1)). According to Petitioners, the Commission has transgressed this line because it “has ordered ISOs and RTOs to pay retail customers for reducing their retail purchases of electricity.” Id. at 28.
But this argument mischaracterizes the rule and papers over a key ambiguity. First, the mischaracterization: Petitioners are wrong inasmuch as they imply that FERC requires all ISOs and RTOs to pay demand response resources a minimum level of compensation (LMP). The compensation requirement promulgated in Order 715 does not apply unless an ISO or RTO “has a tariff provision permitting demand response resources to participate as a resource in the energy market.” 18 C.F.R. § 35.28(g)(l)(v). And the regulation’s requirement that ISOs and RTOs accept bids from demand response resources comes with a key caveat: the re *233 quirement applies “unless not permitted by the laws or regulations of the relevant electric retail regulatory authority.” Id. § 35.28(g)(1)(i)(A); see also id. § 35.28(g)(l)(iii). In other words, there is a carve-out from the compensation requirement for ISOs and RTOs in States where local regulatory law stands in the way. Thus, the Order preserves State regulation of retail markets. This is hardly the stuff of grand agency overreach.
More fundamentally, Petitioners’ argument founders on a statutory ambiguity they ignore. Section 201 makes clear that FERC may regulate “the sale of electric energy at wholesale in interstate commerce” but not “any other sale of electric energy.” 16 U.S.C. § 824(b)(1) (emphasis added). The demand response at issue here is forgone consumption, which is no “sale” at all. Perhaps the phrase “any other sale of electric energy” could be interpreted to include wow-sales that would have been sales in the retail market, but it certainly does not require such a reading. It is reasonable to categorize demand response as neither a retail sale nor wholesale sale under the Federal Power Act. And on this understanding, section 201 “says nothing about” FERC’s power to review compensation rates for demand response in wholesale electricity markets. Connecticut, 569 F.3d at 483.
Nor is Petitioners’ argument under section 201 made any stronger by reference to subsection (a). This prefatory subsection states that while “Federal regulation ... of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest,” federal regulation should “extend only to those matters which are not subject to regulation by the States.” 16 U.S.C. § 824(a). But the Supreme Court has made clear that “the precise reserved state powers language in § 201(a)” is a “mere policy declaration that cannot nullify a clear and specific grant of jurisdiction, even if the particular grant seems inconsistent with the broadly expressed purpose.” New York, 535 U.S. at 22, 122 S.Ct. 1012 (emphasis added) (internal quotation marks omitted). And, as I discuss below, section 206’s specific grant of “affecting” jurisdiction quite clearly authorized FERC to issue Order 74.5.
The most that can be said of section 201 is that it commits regulation of retail sales to the States and regulation of wholesale sales to the Commission. And while it is true that the forgone consumption would have been purchased in the first instance in the retail market, it does not follow from this fact that non-consumption constitutes an “other sale” under section 201(b). There was no sale, period. And the statute does not give.a clear indication that Congress intended to foreclose FERC from regulating non-sales that have a direct effect on the wholesale markets under FERC’s jurisdiction.
Even assuming that the Federal Power Act requires demand response resources to be considered inextricably part of retail “sales” subject solely to State regulation, Order 745 does not engage in the type of “direct regulation” that would violate section 201. See Connecticut, 569 F.3d at 481. Order 745 does not require anything of retail electricity consumers and leaves it to the States to decide whether to permit demand response. All Order 745 says is that if a State’s laws permit demand response to be bid into electricity markets, and if a demand response resource affirmatively decides to participate in an ISO’s or RTO’s wholesale electricity market, and if that demand response resource would in a particular circumstance allow the ISO or RTO to balance wholesale supply and demand, and if paying that demand resource *234 would be a net benefit to the system, then the ISO or RTO must pay that resource the LMP. That is it. This requirement will no doubt affect how much electricity is consumed by a small subset of retail consumers who elect to participate as demand response resources in wholesale markets. But that fact does not render Order 7^5 “direct regulation” of the retail market. Authority over retail rates and over whether to permit demand response remains vested solely in the States.
In this respect, Order 7U5 is similar to the capacity rule in Connecticut that we found did not directly regulate generation facilities. 569 F.3d at 482. Even though increasing the capacity requirement incen-tivized the procurement of additional resources, including new generation facilities, to meet the higher requirement, we recognized that States retained their ultimate authority over the construction of new generation facilities. Id. at 481-82. And because the capacity requirements could be met in other ways aside from building new generators {e.g., through demand response or capacity contracts), it was irrelevant that “public utilities ... overwhelmingly responded to [increased capacity requirements] by choosing to allow construction of new facilities over other alternatives.” Id. at 482. The lesson of Connecticut is that FERC can indirectly incentivize action that it cannot directly require so long as it is otherwise acting within its jurisdiction — and that doing so does not constitute impermissible direct regulation of an area reserved to the States. So too here: Order 7U5 may encourage more demand response, but States retain the ultimate authority to approve the practice.
Second, Petitioners argue that the FERC’s “affecting” jurisdiction under sections 205 and 206 of the Act “does not extend so far as to allow the Commission to regulate directly the retail services that are expressly carved out from the scope of its jurisdiction.” Br. of Pet’rs at 30-31 (citing 16 U.S.C. § 824(a), (b)(1)). To a large degree, this argument simply rehashes Petitioners’ erroneous reading of section 201 and fails for the reasons just described. Demand response resources are promises to forgo consumption of electricity and therefore are not retail “sales.” This is not changed by the fact that forgone consumption would have taken place in the first instance in a retail market. Because of this, the Commission’s asserting “affecting” jurisdiction over demand response does not, as Petitioners suggest, “nullify! ]” a limitation set forth in section 201. Id. at 32.
To be sure, section 206 cannot be read to displace unambiguous jurisdictional limits imposed by section 201(b). Suppose, for example, that FERC issued a rule requiring ISOs and RTOs to condition all wholesale sales of electricity on load-serving entities’ agreeing to charge retail customers with real-time pricing that adjusted hourly for variations in the cost of producing electricity. Such a rule would unambiguously regulate each retail “sale” because it would mandate a particular form of compensation for actual — not counter-factual — retail sales. Thus, while price-responsive retail pricing would no doubt “affect” the wholesale rate, FERC could not claim jurisdiction under sections 205 and 206 because the subchapter which includes these sections “shall not apply to any other sale of electric energy.” 16 U.S.C. § 824(b)(1) (emphasis added). This example plainly differs from the present case because demand response resources are forgone sales or non-sales, and therefore it is at best ambiguous whether the limitation in section 201(b) applies. See Connecticut, 569 F.3d at 483 (“Section 201 prohibits the Commission from regulating generation facilities but says nothing about *235 its power to review the capacity requirements that an [ISO] imposes on member [utilities].”).
To bolster their case, Petitioners invoke the specter of limitless federal authority if FERC is permitted to exercise “affecting” jurisdiction to issue Order 74-5. They caution that “the Commission’s expansive interpretation of its ‘affecting’ jurisdiction would allow it to regulate any number of activities — such as the purchase or sale of steel, fuel, labor, and other inputs influencing the cost to generate or transmit electricity — merely by redefining the activities as ‘practices’ that affect wholesale rates.” Br. of Pet’rs at 33.
This argument cannot carry the day because it ignores at least two important limits. It first ignores section 201’s limit proscribing any “direct regulation” of retail sales (which would bar the hypothetical rule, discussed above, in which FERC tries to mandate that retail sales have dynamic, time-responsive pricing). See Connecticut, 569 F.3d at 481. It also ignores the limitations we announced in CAISO, 372 F.3d 395. There, we held that FERC exceeded its jurisdiction when it replaced the board members of an ISO on the theory that the composition of the ISO’s board was a “practice ... affecting [a] rate” under section 206(a). Id. at 399. We held that “section 206’s empowering of the Commission to assess the justness and reasonableness of practices affecting rates of electric utilities is limited to those methods or ways of doing things on the part of the utility that directly affect the rate or are closely related to the rate, not all those remote things beyond the rate structure that might in some sense indirectly or ultimately do so.” Id. at 403 (emphasis added).
These limits foreclose the parade of hor-ribles marshaled by Petitioners. Like replacing the ISO’s board of directors in CAISO, FERC could not, consistent with Circuit precedent, regulate markets in steel, fuel, labor, and other inputs for generating electricity, which constitute “remote things beyond the rate structure that might in some sense indirectly or ultimately” affect the wholesale rate of electricity. Id.; see also Calpine Corp. v. FERC, 702 F.3d 41, 47 (D.C.Cir.2012) (affirming FERC’s determination that it lacked “affecting” jurisdiction over station power, which is a necessary input to energy production, because there was not a “sufficient nexus with wholesale transactions” (internal quotation marks omitted) (citing City of Cleveland v. FERC, 773 F.2d 1368, 1376 (D.C.Cir.1985))); City of Cleveland, 773 F.2d at 1376 (“[T]here is an infinitude of practices affecting rates and service. The statutory directive must reasonably be read to require the recitation of only those practices that affect rates and service significantly .... ” (emphasis added)).
Order 745 passes the CAISO test quite comfortably because the demand response resources subject to the rule have a quintessentially “direct” effect on wholesale rates. The rule’s compensation requirement applies only when an ISO or RTO can use the demand response resource in lieu of a generation resource to balance supply and demand, and only when paying a demand response resource is cost-effective under the rule’s net benefits test. 18 C.F.R. § 35.28(g)(l)(v)(A). Order 745 thus does not purport to regulate demand response writ large; its compensation requirement applies only when the demand response by definition alters the wholesale electricity price. That is about as “direct” an effect and as clear a “nexus” with the wholesale transaction as can be imagined. See Calpine Corp., 702 F.3d at 47; CAISO, 372 F.3d at 403; City of Cleveland, 773 F.2d at 1376. There can be little doubt that FERC has the authority to review the *236 justness and reasonableness of rates that are so closely connected with the healthy functioning of its jurisdictional markets; this, as we said in Connecticut, is the “heartland of the Commission’s section 206 jurisdiction.” 569 F.3d at 483.
Third, Petitioners argue that the Commission’s orders exceed its jurisdiction because “they unreasonably interfere with existing state and local programs addressing retail customer ‘demand response.’ ” Br. of Pet’rs at 41. Any such effect, however, is merely incidental. As the Commission correctly observed, Order 745 “does not directly affect retail-level demand response programs, nor does it require that demand response resources offer into the wholesale market only. Indeed, the organized wholesale energy markets can and do operate simultaneously with retail-level programs.... ” Order 745-A, 2011 WL 6523756, at *19. FERC’s reforms in Order 745 run on a parallel track with State-level reforms. And to the degree that FERC’s reforms incidentally affect parallel State-level initiatives, that does not render FERC’s actions improper. See Nat’l Ass’n of Regulatory Util. Comm’rs v. FERC, 475 F.3d 1277, 1280 (D.C.Cir.2007) (observing that FERC’s authority to act within its statutory scope of jurisdiction “may, of course, impinge as a practical matter on the behavior of non-jurisdictional” entities).
* :!: *
To summarize: FERC’s jurisdiction turns on two issues: (1) whether demand response is a retail “sale” or is otherwise unambiguously committed to State regulation under the Federal Power Act, and (2) whether sections 205 and 206 clearly grant jurisdiction to FERC to regulate how wholesale-market administrators compensate demand response resources that “directly affect” wholesale prices. Unless we inject quasi-philosophy into our Chevron analysis (what is the sound of one hand clapping? what is the true nature of a sale that was never made? of megawatts never consumed?), I think it clear that the Federal Power Act does not precisely address the first question; forgone consumption is not unambiguously a “sale,” nor does the statute dictate that demand response be treated solely as a matter of retail regulation. And the second question is resolved, in my view, by the terms of Order 74.5 which narrowly apply only to demand response resources that by definition directly affect the wholesale rates of electricity. This falls squarely within the Commission’s “affecting” jurisdiction. See 16 U.S.C. §§ 824d, 824e. The proper course for this court is to defer to the Commission’s well-reasoned and permissible interpretation of its authority under the statute.
B. Level of Compensation
Petitioners also argue that Order 745 is arbitrary and capricious under 5 U.S.C. § 706(2)(A). In reviewing such claims, we consider whether FERC “examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.” Motor Vehicle Mfrs. Ass’n of the U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (internal quotation marks omitted). We also afford significant deference to FERC in light of the highly technical regulatory landscape that is its purview. Indeed, “the Commission enjoys broad discretion to invoke its expertise in balancing competing interests and drawing administrative lines.” Am. Gas Ass’n v. FERC, 593 F.3d 14, 19 (D.C.Cir.2010). And we “afford great deference to the Commission” in cases involving ratemaking decisions as the “statutory requirement that rates be ‘just and reasonable’ is obviously incapable of precise judi *237 cial definition.” Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1, 554 U.S. 527, 532, 128 S.Ct. 2733, 171 L.Ed.2d 607 (2008). Finally, to the extent that the Commission bases its actions on factual findings, such findings are conclusive if supported by substantial evidence. 16 U.S.C. § 825Z (b).
Petitioners’ chief complaint is that Order 715 sets the required compensation level for demand response at the LMP (recall: locational marginal price). LMP equals “the marginal value of an increase in supply or a reduction in consumption at each node within” an ISO’s or RTO’s wholesale market, and is the compensation generation resources generally receive. Order U5-A, 2011 WL 6523756, at *20. Petitioners complain that demand response resources already get the benefit of the forgone expense of retail electricity (abbreviated in the record as “G”). Therefore, Petitioners contend that, under FERC’s rule, demand response resources effectively receive a “double payment”: LMP plus G. Br. of Pet’rs at 47. According to Petitioners, requiring LMP compensation thus results in unjust and discriminatory overcompensation of demand response resources. Id. at 45-50; see also Order U5-A, 2011 WL 6523756, *38 (Moeller, dissenting).
It is of course true, as the majority observes, that FERC is “bounded by the requirements of reasoned decision making.” Am. Gas Ass’n, 593 F.3d at 19. Therefore, FERC was required to provide a “direct response” to the Petitioners’ and the dissenting Commissioner’s concerns about overcompensation. Id. at 20. This is precisely what the Commission did in carefully explaining how Order 715’s setting compensation at the LMP was neither discriminatory nor unjust.
To begin with, FERC provided a thorough explanation for why compensating demand response at the LMP (and not LMP-G) was neither unjust nor over-compensatory. It explained that such compensation was necessary to encourage an adequate level of demand response participation in wholesale markets in light of existing market barriers. See Order 715-A, 2011 WL 6523756, at *15 (noting that Petitioners “fail to acknowledge the market imperfections caused by the existing barriers to demand response”). That last part — the market barriers — is the key. The Commission has identified numerous barriers preventing adequate participation of demand response in wholesale markets. Order 715, 2011 WL 890975, at *16 & n. 122 (citing study). Indeed, citing record evidence, the Commission explained that “the inadequate compensation mechanisms in place today in wholesale energy markets fail to induce sufficient investment in demand response resource infrastructure and expertise that could lead to adequate levels of demand response procurement.” Id. at *16 (quoting a commenter). FERC further explained that “a lack of incentives to invest in enabling technologies can be addressed by making additional investment resources available to market participants” and that paying LMP “to demand response will provide the proper level of investment resources available for capital improvements.” Order 7 15-A 2011 WL 6523756, at *16. In view of these barriers, and the value of demand response participation to ensuring “just and reasonable” wholesale rates, the Commission concluded that LMP was the appropriate level of compensation.
FERC sums it up well:
The Commission acknowledged that noted experts differed on whether paying LMP in the current circumstances facing the wholesale electric market is a reasonable price. In determining that LMP is the just and reasonable price to *238 pay for demand response, the Commission examined some of the previously recognized barriers to demand response that exist in current wholesale markets. These barriers create an inelastic demand curve in the wholesale energy market that results in higher wholesale prices than would be observed if the demand side of the market were fully developed. The Commission found that paying LMP when cost-effective may help remove these barriers to entry of potential demand response resources, and, thereby, help move prices closer to the levels that would result if all demand could respond to the marginal price of energy.
Id. at *17. This is a “direct response” to the points raised by the Petitioners. Am. GasAss’n, 593 F.3d at 20.
With respect to the argument that utilizing the LMP is somehow discriminatory because incomparable resources are paid comparable amounts, the Commission offered reasonable grounds for treating demand response as comparable to generation resources. The Commission observed that, from the perspective of an ISO or RTO, a demand response resource was comparable to a generation resource inasmuch as demand response is equally capable of balancing wholesale supply and demand. Order 745-A 2011 WL 6523756, at *14. This is not the sum total of the explanation, however. In the same section of its order, the Commission explained that “examining cost avoidance by demand response resources is not consistent with the treatment of generation. In the absence of market power concerns, the Commission generally does not examine each of the costs of production for individual resources participating as supply resources in the organized wholesale electricity markets.” Id. at *17; see also id. at *21. FERC continued: “we note that certain generators may receive benefits or savings in the form of credits or in other forms. In these cases, the generators realize a value of LMP plus the credit or savings, but ISOs or RTOs do not take such benefits or savings into account in determining how much to pay those resources.” Id. at *17 n. 122. The point is that the comparability of compensation is assessed without regard to outside costs and credits; just as two generators are both compensated at the LMP even though only one might be receiving a tax credit for producing energy, so too with comparing demand response resources to generation resources. This was clearly explained, and it is reasonable.
This court has no business second-guessing the Commission’s judgment on the level of compensation. See La. Pub. Serv. Comm’n v. FERC, 551 F.3d 1042, 1045 (D.C.Cir.2008) (noting that “[wjhere the subject of our review is ... a predictive judgment by FERC about the effects of a proposed remedy ..., our deference is at its zenith”); Pub. Serv. Comm’n of Ky. v. FERC, 397 F.3d 1004, 1009 (D.C.Cir.2005) (holding that “more than second-guessing close judgment calls is required to show that a rate order is arbitrary and capricious” (citation omitted)); Envtl. Action, Inc. v. FERC, 939 F.2d 1057, 1064 (D.C.Cir.1991) (“[I]t is within the scope of the agency’s expertise to make ... a prediction about the market it regulates, and a reasonable prediction deserves our deference notwithstanding that there might also be another reasonable view.”).
Whatever policy disagreements one might have with Order 74.5’s decision to compensate demand response resources at the LMP (and there are legitimate disagreements to be had), the rule does not fail for want of reasoned decisionmaking. FERC’s judgment is owed deference because it has put forth a reasonable multi-step explanation of its decision to mandate *239 LMP compensation. First, responsive demand is a necessary component of a well-functioning wholesale market, and FERC understood that its obligation to ensure just and reasonable rates required it to facilitate an adequate level of demand response participation in its jurisdictional markets. See Order 745, 2011 WL 890975, at *16. Second, FERC concluded that market barriers were inhibiting an adequate level of demand response participation. See id. Third, FERC concluded that mandating LMP would provide the proper incentives for demand response resources to overcome these barriers to participation in the wholesale market. See id.; see also Notice of Proposed Rulemak-ing, Demand Response Compensation in Organized Wholesale Energy Markets, reprinted in J.A. 208, 220-21 (stating that “demand response resources react correspondingly to increases or decreases in payment” and citing study showing that switching from LMP to LMP-G compensation resulted in a 36.8% decrease in demand response participation in the ISO being studied).
III. Conclusion
FERC had jurisdiction to issue Order 745 because demand response is not unambiguously a matter of retail regulation under the Federal Power Act, and because the demand response resources subject to the rule directly affect wholesale electricity prices. See 16 U.S.C. §§ 824d, 824e. And the Commission’s decision to require compensation equal to the LMP, rather than LMP — G, was not arbitrary or capricious. The majority disagrees on both points. The unfortunate consequence is that a promising rule of national significance— promulgated by the agency that has been authorized by Congress to address the matters in issue — -is laid aside on grounds that I think are inconsistent with the statute, at odds with applicable precedent, and impossible to square with our limited scope of review. I therefore respectfully dissent.